UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>INTERNATIONAL SHIPHOLDING<br>CORPORATION, *et al.*,<br><br>          Reorganized Debtors. | Chapter 11<br><br>Case No. 16-12220 (SMB)<br><br>Jointly Administered |
| BOARD OF TRUSTEES OF THE MEBA<br>PENSION TRUST – DEFINED BENEFIT<br>PLAN; BOARD OF TRUSTEES OF THE<br>MASTERS, MATES & PILOTS PENSION<br>PLAN; and BOARD OF TRUSTEES OF THE<br>MASTERS, MATES & PILOTS<br>ADJUSTABLE PENSION PLAN,<br><br>          Plaintiffs,<br><br>      — against —<br><br>CG RAILWAY, LLC, d/b/a CG RAILWAY,<br>INC., BULK SHIPHOLDING, INC.; EAST<br>GULF SHIPHOLDING, INC.; JOHN DOE<br>CORPORATIONS "1" THROUGH "100" and<br>OTHER JOHN DOE ENTITIES "1"<br>THROUGH "100,"<br><br>          Defendants. | Adv. Pro. No. 19-01006 (SMB) |

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

SLEVIN & HART, P.C.
1625 Massachusetts Ave., N.W., Suite 450
Washington, DC 20036

        Jeffrey S. Swyers, Esq.
        Christopher M. Leins, Esq.

*Attorneys for Plaintiffs*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

— and —

2300 N. Field Street, Suite 1800
Dallas, TX 75201

Roxanne Tizravesh, Esq.
Marty L. Brimmage Jr., Esq.

*Attorneys for Defendant, CG Railway, LLC*

**STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE:**

The Plaintiffs, the Masters, Mates & Pilots Pension Plan the Masters, Mates &

Pilots Adjustable Pension Plan (collectively, the "MM&P Pension Plans") and the MEBA

Pension Trust – Defined Benefit Pension Plan ("MEBA Pension Plan," and together with

the MM&P Pension Plans, the "Plaintiffs" or the "Pension Plans") commenced this

adversary proceeding against the Defendant CG Railway, LLC ("Defendant" or "CG

Railway")[1] seeking declaratory relief that two, virtually identical settlement agreements

described below did not release the Defendant from withdrawal liability under ERISA.

The Defendant counterclaimed for declaratory and injunctive relief contending that it

was released.

The Court conducted a four-day, virtual trial during which it heard the testimony

of fourteen witnesses and received approximately 200 documents into evidence.  Based

upon the evidence adduced and for the reasons that follow, the Court concludes that the

---

[1]    The other defendants in this action include Bulk Shipholding, Inc. ("Bulk Shipholding"); East Gulf
Shipholding, Inc. ("East Gulf"); John Doe Corporations "1" Through "100" and Other John Doe Entities "1"
Through "100." Defendants Bulk Shipholding and East Gulf dissolved in April 2017 and could not be served.

settlement agreements released the Defendant from withdrawal liability.  Accordingly,

the Complaint is dismissed, the Defendant is awarded judgment on Count I of its

counterclaims for declaratory relief and Count II of its counterclaims for injunctive relief

is dismissed.

## FINDINGS OF FACT[2]

### A.    Pre-Bankruptcy Relationship Between the Parties

At all relevant times, the Debtors were engaged in the business of waterborne

cargo transportation and operated a fleet of both domestic and foreign vessels that

provided domestic and international marine transportation services to commercial and

governmental customers.  (SF 9.)  International Shipholding Corporation ("ISH") was a

publicly traded holding company that directly or indirectly owned or had interests in

twenty-six subsidiaries.  (See *Declaration of Erik L. Johnsen, President and Chief*

*Executive Officer, Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First*

*Day Filings* ("First Day Declaration") (DX 4), at ¶ 15; *id*, Ex. A (Organizational Chart).)

ISH, Waterman Steamship Corporation, Sulphur Carriers Inc., and Central Gulf Lines,

Inc. (collectively, the "Signatory Debtors") were parties to prepetition collective

bargaining agreements ("CBAs," and singularly, "CBA") with the Marine Engineers'

Beneficial Association ("MEBA"), the union that represented the licensed engineering

officers, and the International Organization of Masters Mates & Pilots ("MM&P," and

together with MEBA, the "Unions"), the union that represented the deck officers.  (SF

---

[2]    In this opinion, PX and DX refer, respectively, to the Plaintiffs' and Defendant's exhibits.  "SF" followed by a number (*e.g.*, SF 1) refers to a paragraph in the Stipulated Facts in Part III of the *Joint Pretrial Order*, dated Oct. 22, 2020 ("JPTO") (ECF Doc. # 51).  "ECF Doc. #" refers to the number of the docket entry in the electronic docket in this adversary proceeding.  Finally, "Tr." followed by a parenthetical notion of a date refers to the trial transcript of that date.  (ECF Doc. ## 69-72.)

10-11; JPTO at p. 2.)

The CBAs required the Signatory Debtors to make monthly contributions to various employee benefit plans, including the Pension Plans.[3]  The Pension Plans were multiemployer defined benefit plans, meaning that non-affiliated employers also participated in the Pension Plans and made contributions on behalf of their own employees.  The Pension Plans and the Unions were separate legal entities, but the two were linked.  The CBAs imposed the obligation to make the contributions to the Pension Plans.  In addition, each Pension Plan was managed by a Board of Trustees consisting of representatives of the Union (the "Union Trustees") and the contributing employers (the "Employer Trustees").  Don Marcus, the president of MM&P, was a Union Trustee and the chairman of the Board of the Trustees that managed the MM&P Pension Plans.  Marshall Ainley, the president of MEBA, was a Union Trustee and the chairman of the Board of the Trustees that managed the MEBA Pension Plan.

## B.     The Debtors Prepare for and File Bankruptcy

In mid-2016, the Debtors engaged Blackhill Partners, LLC ("Blackhill") as their financial advisor and retained Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as bankruptcy legal counsel.  (SF 15-16.)  In the early summer of 2016, Blackhill and the Debtors initiated discussions with SEACOR Capital Corp. (together with SEACOR Holdings Inc., "SEACOR") to become the stalking horse purchaser of ISH and commit the funds necessary for the Debtors to reorganize.  (SF 17.)  On July 29, 2016, ISH's

---

[3]     The Pension Plans and the other employee benefit plans are sometimes referred to collectively as the "Benefit Plans."

Chairman and President, Erik Johnsen, advised the Board that the company had obtained debtor-in-possession financing from SEACOR, and the Board unanimously authorized Akin Gump to file chapter 11 petitions.  (SF 18.)[4]

ISH and seventeen subsidiaries, including the other Signatory Debtors, filed chapter 11 petitions in this Court on July 31, 2016 and continued to operate their businesses as debtors in possession in their jointly administered cases.  (SF 19, 22, 23; First Day Declaration ¶ 15.)  Nine subsidiaries, including wholly owned subsidiary CG Railway, (SF 109, 113), did not file chapter 11 petitions.  (*See* First Day Declaration ¶ 15 & Ex. A; SF 20.)  The ISH Board determined that CG Railway should not file for bankruptcy because it was a class three railroad under the Bankruptcy Code, which would have required a bankruptcy trustee to be appointed in the bankruptcy case.  (SF 21.)

Before or shortly after the commencement of the bankruptcy cases, ISH and SEACOR began to negotiate an agreement pursuant to which SEACOR would acquire ISH through a chapter 11 plan.  As concerns this lawsuit, SEACOR drew two "lines in the sand" that could never be crossed.  First, Reorganized ISH, owned post-confirmation by SEACOR, would not continue to make contributions to the Pension Plans.  Second, the withdrawal liability triggered by the Signatory Debtors' withdrawal from further participation in the Pension Plans could not survive and had to be eliminated.  (Tr. (1/20) at 14:13-18.)  According to information provided by the Pension Plans' attorneys,

---

[4]      After the commencement of the cases, the Court approved SEACOR's debtor-in-possession loan. (SF 31-32.)

a withdrawal in 2016 would generate around $56 million in withdrawal liability. (DX 24.) Eric Fabrikant, SEACOR's chief operating officer, emphasized in an internal, November 3, 2016 email, that "[u]nder no circumstance does SEACOR inherit any pension withdrawal liability incurred under the existing CBAs." (DX 28.)

To facilitate the strategy to acquire ISH, the Debtors and SEACOR entered into a Restructuring Support Agreement ("RSA"). (DX 33; SF 33.) ISH filed the RSA on October 28, 2016, and the Court approved it on November 21, 2016. (SF 38.) The RSA attached and incorporated a Term Sheet that set out the outlines of the plan that SEACOR would support. The Term Sheet confirmed SEACOR's commitment to provide new financing of $25 million and a cash contribution of $10 million in exchange for 100% of the equity in the Reorganized ISH. (RSA Term Sheet at pp. 2, 4.) It further provided that the Debtors would "use commercially reasonable efforts to assist in all union negotiations and to mitigate any withdrawal liability and cause any such withdrawal liability to be treated as an unsecured liability." (*Id.* at 6.) The RSA Term Sheet cautioned that "to the extent there is any withdrawal liability and such withdrawal liability is found to be an administrative expense claim, there will be no additional funds provided by SEACOR under this proposal to satisfy such claim." (*Id.*) Finally, SEACOR agreed to offer employment to the Unions' members on terms no less favorable than SEACOR's current union employees but "not including any obligation to contribute to any defined benefit pension plans that would be new to SEACOR." (*Id.* at 6-7.)

SEACOR expected that all the withdrawal liability issues would be dealt with in bankruptcy proceedings. It did not distinguish between debtor and non-debtor subsidiaries, viewing them collectively as ISH, and understood that all withdrawal

6

liability would be extinguished upon its acquisition of Reorganized ISH. (Tr. (1/20) at 13:14-14:18.) A series of internal reports and updates informed the SEACOR Board of Directors that ISH's withdrawal from the Pension Plans would trigger approximately $58 million in withdrawal liability that would be classified as an unsecured claim and "disposed of in the bankruptcy," (DX 56, at p. 0007; PX 37, at SEACOR-000000520; PX 40, at p. 1023), there would be "no further obligation from ISH to the Pension Plans post reorganization," (DX 56, at p. 0007), and Reorganized ISH would emerge with "zero" carryover liabilities owed to the Unions. (DX 27, at p. 0002).[5]

## C.    Negotiations Leading to Settlement Agreements

In November 2016, SEACOR began a series of negotiations with the Unions regarding new CBAs in contemplation of SEACOR's acquisition of ISH. Prior to then, Michael Cameron, an ISH employee, had met with Marcus to discuss a variety of Union/Pension Plan issues, including the waiver of the MM&P Pension Plans' withdrawal liability claims. Marcus stated that the Union could do nothing about withdrawal liability, an ERISA issue, and expressed a concern that the MM&P Pension Plan could not waive ISH's withdrawal liability without granting the same waiver to the other contributing employers. (DX 21.)

Marcus and Ainley, the presidents of their respective Unions, participated in the CBA negotiating sessions with SEACOR and ISH. As discussed, Marcus and Ainley were

---

[5]    The Plaintiffs contend that SEACOR's statement that withdrawal liability would be "disposed of in the bankruptcy" is evidence of SEACOR's understanding that the waiver of withdrawal liability was limited to the Debtors in the bankruptcy cases. As noted in the text, SEACOR believed that all withdrawal liability, including the liability of the non-debtor subsidiaries, would be eliminated through the bankruptcy. In fact, this is precisely what happened.

also the chairmen, respectively, of the MM&P and MEBA Pension Plans, and the
Pension Plans' counsel also attended the negotiating sessions.  (Tr. (1/21) at 143:2-18;
145:20-146:6.)  SEACOR's chief negotiator, Michael Lowry, testified credibly that he
told the participants during the CBA negotiations that the release of withdrawal liability
was a must, a "non-starter," (Tr. (1/21) at 230:16-231:22), and his statements were
confirmed by the ISH participants that attended the negotiating sessions, including
Cameron, (Tr. (1/19) at 145:24-146:8; 163:8-22), and Lauren Leyden, Esq., an Akin
Gump labor partner.  (Tr. (1/21) at 149:8-150:4.)[6]

The Unions pushed back on SEACOR's refusal to continue to contribute to the
Pension Plans, another SEACOR "non-starter," but did not discuss or attempt to
negotiate withdrawal liability, (Tr. (1/21) at 231:23-232:11; Tr. (1/19) at 163:23-164:7),
possibly because it was not a subject to be dealt with under the new CBAs.  The
obligation to make contributions was a CBA issue but withdrawal liability was a
statutory liability owing to the Pension Plans and was not negotiable by the Unions in
connection with the new CBAs.  (*See* Tr. (1/21) at 203:9-17.)  The collective bargaining
negotiations eventually resulted in new CBAs ("New CBAs"), contingent on SEACOR's
acquisition of Reorganized ISH under a plan.  Under the New CBAs, Reorganized
ISH/SEACOR would not be required to make any contributions to the Pension Plans.
(SF 56.)

---

[6]    Although Marcus and Ainley participated in the CBA negotiations as representatives of their
Unions rather than the Pension Plans, the Plaintiffs do not argue that they were free to ignore information
that might affect the rights of the Pension Plans.  (*See* Tr. (1/22) at 20:18-21:12.)  Furthermore, the
Pension Plans' lawyers also attended.

On November 28, 2016, Leyden sent Christopher Leins, Esq. of Slevin & Hart, the

Pension Plans' counsel, proposed identical "waiver agreements for MEBA and MMP"

(referred to singularly as the "November Waiver Letter") and stated "[p]lease let me

know when you want to discuss further." (DX 35; SF 58.)  The November Waiver Letter

provided a complete release in favor of ISH, Reorganized ISH, SEACOR, and their past,

present and future subsidiaries and affiliates, subject to the Benefit Plans' rights to file

unsecured claims in the bankruptcy cases:

> By signing below, the [Benefit Plans] agree not to assert any claims,
> on their behalf or on behalf of any plan participations or any other person
> or entity, against ISH, Reorganized ISH, or Seacor Capital Corp., or any of
> the foregoing's respective past, present, or future subsidiaries or affiliates,
> relating to unpaid contributions to the [Benefit] Plans, withdrawal or
> cessation from participation in the [Benefit] Plans, or any other obligation,
> contractual or statutory.  For the avoidance of doubt, nothing herein shall
> be construed to prohibit the [Benefit] Plans from pursuing a general
> unsecured claim against the Debtors in the matter of *In re: International
> Shipholding Corporation, et al.*, Case No. 16-12220 (SMB), in the United
> States Bankruptcy Court for the Southern District of New York for any
> unpaid contributions owed to the [Benefit] Plans or any withdrawal
> liability incurred by ISH or any other past or present subsidiary or affiliate
> thereof, as of the Effective Date of the Plan of Reorganization dated
> November 14, 2016.

(DX 35; SF 59.)  Leyden testified that all the points contained in the November Waiver

Letter had been discussed with or relayed to the Pension Plan representatives, including

Leins, Barry Slevin, Esq., and Lynn Bowers, Esq., all of Slevin & Hart.  (Tr. (1/21) at

203:18-207:18; 160:4-11.)

The November Waiver Letter did not set forth any payments that the Debtors

would make, and the Debtors would not have the cash to satisfy the Pension Plans' (or

any other creditors') administrative and priority claims as required to confirm their

plan.  *See* 11 U.S.C. § 1129(a)(9).  On December 16, 2016, the Benefit Plans had filed

priority claims aggregating $4,103,092.87, (*see* SF 45-46), and unsecured, contingent

withdrawal liability claims in the aggregate amount of $56,082,502 (collectively, the

"Contingent Withdrawal Liability Proofs of Claim").  (*See* SF 47.)  Each Contingent

Withdrawal Liability Proof of Claim stated that "[u]nder Section 4001(b)(1) of ERISA,

29 U.S.C. § 1301(b)(1), all trades or business under common control with the employer

contributing to the Plan at the time are liable for withdrawal liability," (SF 48), and

"[t]he Plan reserves the right to seek administrative priority for all or part of its

withdrawal liability claim against all Debtors pursuant to 11 U.S.C. §§ 503, 507."  (SF

49.)[7]

As the confirmation date approached, negotiations over the payment of the

Pension Plans' administrative and priority claims took on greater urgency.  On January

6, 2017, Slevin & Hart requested "information on the priority figures in the Disclosure

Statement so that we can evaluate ISH's counteroffer." (SF 61.)  During the next month,

counsel for the parties exchanged financial information regarding the funds available to

pay the Pension Plans' claims.  The discussions and information exchanged primarily

concerned the payment of the administrative and priority claims as there would be little

if anything for unsecured creditors.  On January 31, 2017, Sarah Schultz, Esq., an Akin

Gump bankruptcy partner, sent an email to Leins, (PX 14), attaching a document

entitled, "International Shipholding Corporation Priority and Administrative Claims as

Filed as of January 30, 2017." (PX 15.)  The document listed administrative and priority

---

[7]      On December 16, 2016, other Benefit Plans filed administrative claims in the aggregate sum of
$1,552,756.93, but ultimately withdrew the administrative claims as part of the settlements that are the
subject of this litigation.  (SF 50, 52.)

claims aggregating $10,351,864.20 asserted in the ISH bankruptcy as of January 30, 2017, including the Pension Plans' claims for unpaid contributions. (PX 15.)[8]  As of January 30, 2017, no administrative and priority claims had been filed for any potential withdrawal liability, but the bar date to file administrative claims had not yet been set by the Bankruptcy Court. (SF 66.)

As just mentioned, the Debtors did not have enough cash to pay the administrative and priority claims asserted by the Pension Plans and the SIU Benefit Plans, and informed the plans that SEACOR would not contribute any additional funds to satisfy their claims. (DX 68, at pp. 0002, 0003.)  The Debtors left it up to the three Benefit Plans (MEBA, MM&P, and SIU) to allocate the available cash (approximately $4 million) among themselves, and they ultimately agreed on a pro rata allocation based on their administrative and priority claims. (Tr. (1/21) at 132:18-25.)

On February 3, 2017, Schultz sent Leins an email, (PX 16), which attached materials prepared by Blackhill showing, among other things, the distributions under the Debtors' proposal and under a liquidation. (PX 17; DX 68).[9]  The attachment indicated that under the Debtors' proposal, each benefit plan would receive 62% of their total administrative and priority claims, inclusive of prior payments. (DX 68, at p. 0008.)  The Blackhill attachment also stated that if the SEACOR plan was abandoned, an alternative plan would produce little to no distributable value beyond secured

---

[8]     The third administrative Pension creditor was the SIU Benefit Plans.

[9]     Schultz's email mistakenly omitted the attachment.  It was subsequently forwarded by Blackhill. (*See* PX 16.)

creditors.  (DX 68, at p. 0009.)  In listing the assets available for distribution under both the SEACOR plan and under a chapter 7 liquidation, the Blackhill attachment included CG Railway's $1 million in cash.  (DX 68, at pp. 0013, 0014, 0015.)

According to Ellen Silver, Esq., counsel to the SIU Benefit Plans, the allocation contained an error.  (*See* PX 22.)  On February 8, 2017, Schultz sent an email to counsel for the three Benefit Plans, (PX 22), attaching a document, (PX 23), that contained a proposed settlement allocation of $1,224,258.30 to the MM&P Benefit Plans, $1,319,253.50 to the MEBA Benefit Plans, and $1,106,465.90 to the SIU Benefit Plans. (SF 74.)  The proposal would pay 72% of their administrative and priority claims, inclusive of prior payments.  (PX 23.)  On February 10, 2017, Leins advised Schultz that the Pension Plans had agreed to the proposed settlement allocation, (SF 75), "contingent on our clients' approval of the terms of a written settlement agreement."  (PX 24; *see* SF 75, 76.)  At a special meeting of the ISH Board of Directors held the same day, Erik Johnsen, ISH's Chairman and CEO, advised the Board that "the Company received approval from the Company's union pension plans as to the resolution of alleged administrative priority claims asserted by the pension plans."  (PX 25, at ISH-000000054.) [10]

## D.    The Settlement Agreements

---

[10]    The board meeting minutes did not mention withdrawal liability.  The Plaintiffs argue that Johnsen's failure to mention withdrawal liability to the Board proves that it was not part of the settlement.  Johnsen testified credibly that the settlement of the administrative and priority claims was the last piece of the puzzle, and he was passing this information on to the Board.  (Tr. (1/19) at 71:2-15.) Further, Johnsen's statement to the Board does not purport to provide a full description of the Settlement Agreement because even the Plaintiffs concede that it did more than resolve the administrative and priority claims.

On February 10, 2017, Schultz sent an email to the three Benefit Plans' counsel stating, "[a]ttached please find the settlement letters with respect to each of the plans administrative and priority claims. Please let us know if you have any questions or comments." (DX 73.) The email attached identical draft settlement agreements except for the settlement amounts (referred to singularly as the "February Draft"). (DX 74; *see* SF 77.) The only difference between the November Waiver Letter and the February Draft was the insertion of the amount of the Settlement Payment agreed to by the parties. (*Compare* DX 35 *with* DX 74; *see* DX 75 (demonstrative comparing drafts).) The February Draft, like the November Waiver Letter, released ISH, Reorganized ISH SEACOR, and their past, present, and future affiliates in exchange for the Settlement Payment, with the proviso that the Pension Plans could file unsecured claims in the bankruptcy case for unpaid contributions or withdrawal liability incurred by a past or present subsidiary or affiliate as of the Effective Date. The February Draft did not allocate the Settlement Payments to administrative or priority claims. It simply involved the payment of a sum of money for a release. Between November 28, 2016, when Leyden sent the November Waiver Letter, and February 10, 2017, the attorneys for the parties discussed the amount of the payment but never discussed the withdrawal liability waiver, (Tr. (1/21) at 160:12-25), although counsel for the Benefit Plans were invited to discuss the November Waiver Letter in the email that transmitted it.[11] (DX 35.)

On February 10, 2017, Leins sent an email to Schultz stating that they had some

---

[11] The SIU pension plan was fully funded so the Signatory Debtors' withdrawal from participation in that plan would not trigger withdrawal liability.

13

revisions and comments and asked for a Microsoft Word version of the draft, but the email did not hint at what they might be. (PX 28.) Leins sent Schultz the revised drafts three days later, attaching redlined revisions to the proposed documents, (*see* PX 30, 31), asking if she had any questions and stating that if the terms were agreeable, he would send them to his clients for execution. (PX 29.) There had been no discussions prior to sending the revisions.

Leins' email did not identify or refer to any substantive changes made to the second paragraph. Quoted below is a red-lined version of the changes, (PX 32), which were identical for the MM&P and MEBA Pension Plans except for the amount of the Settlement Payment. Although it is a single paragraph in the draft, I have divided the paragraph into three to correspond to its three parts — (i) the Settlement Payment and the waiver, (ii) the reclassification of any excess administrative and priority claims for unpaid contributions as unsecured claims, subject to the proviso that any unpaid contribution claims accruing after the date of the Settlement Agreement could be pursued as administrative claims, and (iii) the right to assert withdrawal liability as a general unsecured claim:

> By signing below, in exchange for a payment from ISH and/or its subsidiaries in the total amount of [the Settlement Amount] (the "Settlement Payment"), payable within 15 business days of the Effective Date of the Plan (as defined therein), the [Pension Plans] agree not to assert any priority or administrative claims, on their behalf or on behalf of any plan participationts or any other person or entity, against ISH, Reorganized ISH, or Seacor Capital Corp., or any of the foregoing's respective past, present, or future subsidiaries or affiliates, relating to unpaid contributions to the [Pension Plans] owed through the date of this letter, or any withdrawal liability incurred by ISH or any other past or present subsidiary or affiliate thereof.
>
> All priority or administrative claims timely filed by the [Pension Plans] in excess of the Settlement Payment shall be converted to timely

14

filed general unsecured claims.   ~~withdrawal or cessation from participation in the [Pension Plans], or any other obligation, contractual or statutory.~~ For the avoidance of doubt, nothing herein shall be construed to prohibit the [Pension Plans] from pursuing a general unsecured claim against the Debtors in the matter of *In re: International Shipholding Corporation, et al.*, Case No. 16-12220 (SMB), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Proceeding") for any unpaid contributions owed to the [Pension Plans] that accrued prior to the date of this letter or from pursuing an administrative claim for unpaid contributions owed to the [Pension Plans] that accrued ~~after~~ from the date of this letter through the Effective Date of the Plan.

Additionally, nothing herein shall be construed to prohibit the [Pension Plans] from pursuing a general unsecured claim against the Debtors in the ~~matter of *In re: International Shipholding Corporation, et al.*, Case No. 16-12220 (SMB), in the United States Bankruptcy Court for the Southern District of New York~~ Bankruptcy Proceeding for any contingent, estimated, or actual ~~or any~~ withdrawal liability incurred by ISH ~~or any other past or present subsidiary or affiliate thereof, as of the Effective Date of the Plan of Reorganization dated November 14, 2016~~ as a result of any Debtor entity effecting a partial or complete withdrawal from the [Pension Plans]. Upon any Debtor entity effecting a partial or complete withdrawal from the [Pension Plans], the [Pension Plans] shall amend its contingent claim (No. 1336) and assert a general unsecured claim against each of the Debtors and such claims shall be deemed timely filed.

Leyden reviewed the revisions and considered them stylistic rather than substantive. Although the drafting was inartful, she was satisfied that the revisions did not deprive ISH, Reorganized ISH, or SEACOR of their bargain: a cap on the administrative and priority claims and a waiver of withdrawal liability claims against all past, present, and future subsidiaries and affiliates except to the extent they could assert withdrawal liability as unsecured claims in the bankruptcy cases. (Tr. (1/21) at 174:7-175:20.) She informed Leins and Jeffrey Swyers, Esq. of Slevin & Hart that she had no objection to the changes. (DX 83, at p. 0002.)

The Settlement Agreements, both dated Februarys 13, 2017, were executed by the Pension Plan representatives on February 17, 2017. Don Marcus and Edward Morgan,

an Employer Trustee, executed the Settlement Agreement on behalf of the MM&P

Pension Plans.  (PX 1.)  Marshall Ainley and Ed Hanley, an Employer Trustee, executed

the Settlement Agreement on behalf of MEBA Pension Plans.  (PX 2.)

   The Settlement Agreements paved the way for confirmation.  On March 2, 2017,

the Bankruptcy Court confirmed the *First Amended Modified Joint Chapter 11 Plan of*

*Reorganization for International Shipholding Corporation and its Affiliated Debtors*

("Plan").[12]  (SF 97.)  Paragraph 35 of the Confirmation Order approved the settlements

with the Pension Benefit Plans and authorized payment of the settlement amounts:

> **MM&P Benefit Plans:** The Debtors shall make a payment to the MM&P
> Benefit Plans in the amount of $1,224,258.30 within fifteen (15) business
> days of the Effective Date. In exchange, the MM&P Plans shall not assert
> any priority Claims or Administrative Expense Claims against the Debtors,
> the Reorganized Debtors, or SEACOR.
>
> **MEBA Benefit Plans:** The Debtors shall make a payment to the MEBA
> Benefit Plans in the amount of $1,319,253.50 within fifteen (15) business
> days of the Effective Date. In exchange, the MEBA Plans agree not to
> assert any priority Claims or Administrative Expense Claims against the
> Debtors, the Reorganized Debtors, or SEACOR.

(Footnotes omitted).[13]

   The Plaintiffs argue that the description of the settlements solely in terms of

---

[12]    A copy of the Plan is attached to the *Findings of Fact, Conclusions of Law and Order
Confirming First Amended Modified Joint Chapter 11 Plan of Reorganization for International
Shipholding Corporation and Its Affiliated Debtors* (the "Confirmation Order").  (DX 95.)

[13]    The Confirmation Order also stated that the

   Debtors and the [Benefit Plans] reached an agreement with respect to the treatment of
   the administrative and priority claims asserted by the [Benefit Plans].  As a result of these
   agreements, in full satisfaction of Administrative Expense Claims and priority Claims
   asserted by the [Benefit Plans], within fifteen (15) days of the Effective Date, the Debtors
   will make an aggregate payment of $4 million to the [Benefit Plans]" and the "[Benefit
   Plans] will retain the right to assert General Unsecured Claims against the Debtors.

(Confirmation Order ¶ U.)

administrative and priority claims shows that the parties were only settling the administrative and priority claims in the bankruptcy cases. However, even the Plaintiffs must concede that the Confirmation Order did not include a complete description of components of the settlements that both sides acknowledge was reached. In particular, although hinted at in paragraph U, it did not mention that any excess administrative or priority contribution claims accrued through the date of the Settlement Agreement as well as any contingent claims for withdrawal liability would be treated as allowed, unsecured claims, and unpaid contribution claims accruing after February 13, 2017 could be pursued as administrative claims.

On June 18, 2017, Mike Cameron of ISH notified the MEBA Pension Plan that ISH, Central Gulf Lines, Inc., and Waterman Steamship Corporation, and any of the foregoing's past or present subsidiaries and affiliates, would stop making contributions to the MEBA Pension Plan on July 2, 2017.[14] (DX 101; SF 105.) The Plan of Reorganization became effective on July 3, 2017 (the "Effective Date"). (SF 99.) On the Effective Date and in accordance with the Plan of Reorganization, ISH reorganized and SEACOR acquired 100% of the equity interests in ISH, which owned CG Railway, currently a non-debtor affiliate of SEACOR and the Reorganized Debtors. (*See* SF 110-11.)

### E.    This Adversary Proceeding

The question presented by this adversary proceeding is whether the Settlement

---

[14]    The record does not include a similar notice sent to the MM&P Pension Plans. However, given MM&P Pension Plans' assertion of withdrawal liability, I must assume one was sent at around the same time.

Agreements released CG Railway from withdrawal liability that accrued when the Signatory Debtors withdrew from further participation in the Pension Plans. CG Railway, a wholly owned non-debtor subsidiary of ISH, was under the common control of the Debtors at the time they withdrew from the Pension Plans. (SF 114.) Both Marcus, (*see* Tr. (1/20) at 78:10-25; 79:24-82:1), and Ainley, (*see* Tr. (1/20) at 152:4-15), knew that CG Railway was an ISH subsidiary, was a member of the ISH control group, and would be liable for ISH's withdrawal liability.

In letters dated March 2, 2018, (PX 49), and March 8, 2018, (PX 50, 51) (the "Notice and Demand Letters"), the Pension Plans notified CG Railway, Bulk Shipholding, and East Gulf of withdrawal liability in the total amount of $58,856,388 due to the Signatory Debtors' permanent cessation of covered operations on July 2, 2017. (SF 115-16.) In letters dated May 25, 2018, (PX 52, 53), Defendant CG Railway's counsel responded that all of the issues regarding the withdrawal liability of the Debtors and its control group members were resolved by the Settlement Agreements which released ISH, any and all past, present, and future members of its control group for either unpaid contributions or withdrawal liability. (*Accord* SF 118.)[15] On September 18, 2018 and September 19, 2018, the MEBA Pension Plans and MM&P Pension Plans, respectively, responded that the Settlement Agreements only waived claims the Pension Plans held against the Debtors in the bankruptcy cases and did not waive any

---

[15]    On November 9, 2018, the Pension Plans amended their Contingent Withdrawal Liability Proofs of Claim as claims for actual withdrawal liability "based on a July 2017 withdrawal date" in the following amounts: MEBA Pension Plan - $23,305,416, MM&P Pension Plan - $25,533,895, and the MM&P APP - $17,077. *See* Claims Nos. 1490, 1491, and 1492. (SF 55.)

withdrawal liability claims that the Pension Plans could assert against non-debtor subsidiaries or non-debtor affiliates of the Debtors.  (SF  121-22.)

The Plaintiffs commenced this adversary proceeding on January 28, 2019 against non-debtor Defendants CG Railway, Bulk Shipholding, East Gulf, John Doe Corporations "1" through "100," and other John Doe Entities "1" through "100."  (SF 1; *see Complaint for Declaratory Judgment*, dated Jan. 28, 2019 (ECF Doc. # 1).)  The *Complaint* sought a declaration that the Settlement Agreements did not release the Defendants from withdrawal liability.  As noted, Defendants East Gulf and Bulk Shipholding were never served with the Adversary Complaint because both entities dissolved in April 2017.  (SF 2.)  On March 28, 2019, CG Railway, the only remaining Defendant, filed its Answer and Counterclaims.  (*See Defendant CG Railway, LLC's Answer and Counterclaims to Complaint*, dated Mar. 28, 2019 (ECF Doc. # 9).)  The Counterclaims included two counts.  Count I sought a mirror image declaration that the Settlement Agreements released CG Railway from withdrawal liability.  Count II sought a permanent injunction preventing the Plaintiffs from pursuing any claims for unpaid contributions or withdrawal liability.  The Plaintiffs filed a reply to the Counterclaims. (*See Plaintiffs' Answer to Defendant CG Railway LLC's Counterclaims,* dated Apr. 16, 2019 (ECF Doc. # 10).)

On October 3, 2019, the Court denied cross-motions motions for summary judgment concluding that the Settlement Agreements were ambiguous.  The most obvious ambiguity was the Settlement Agreement's limitation on administrative and priority claims against past, present and future subsidiaries, including non-debtor subsidiaries.  Notions of administrative and priority claims as used in the Settlement

Agreement are limited to bankruptcy cases and are meaningless outside of bankruptcy. In addition, the relationship between the limitation on administrative and priority claims for unpaid contributions and the arguably unlimited waiver of withdrawal liability incurred by non-debtor subsidiaries remained ambiguous.

## DISCUSSION

### A.     Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334(b) and the *Amended Standing Order of Reference*, No. M 10-468, 12

Misc. 00032 (S.D.N.Y. Jan. 31, 2012).  Although the parties are non-debtors, the

Settlement Agreements were entered into by the Plaintiffs and the Debtors to facilitate

the confirmation of the Plan and were an integral part of the Plan.  (Confirmation Order

¶ BB.)  Accordingly, the Settlement Agreements arose in the Debtors' bankruptcy cases

and the adversary proceeding is a core proceeding, but at a minimum, the adversary

proceeding relates to the bankruptcy cases and is non-core.

In addition, the Plan and the Confirmation Order provide that the Court shall

have jurisdiction over this dispute.  Article 12 of the Plan states, among other things,

that the Court retains jurisdiction to "to enter such orders as may be necessary or

appropriate to implement or consummate the provisions of the Plan, the Confirmation

Order, and all other orders, contracts, . . . releases, . . . and other agreements or

documents created in connection with the Plan or Disclosure Statement," (Plan §

12.1.6), and "resolve any other matters that may arise in connection with or relating to

the Plan, the Disclosure Statement, the Confirmation Order, or any contract, . . .

release, . . . or other agreement or document created in connection with the Plan or the

Disclosure Statement."  (Plan § 12.1.15.)  The Confirmation Order states that "this Court

may properly, and from and after the Effective Date shall, to the fullest extent as is

legally permissible, retain exclusive jurisdiction over . . . all matters arising under,

arising out of, or related to, the Chapter 11 Cases and the Plan (i) as provided for in

Article 12 of the Plan . . . ."  (Confirmation Order ¶ 48.)

Finally, even if the Court otherwise lacked the Constitutional authority to enter a final judgment for any reason, the parties have expressly consented to the Court's authority to enter a final judgment.  (JPTO at p. 3.)

**B.    Interpretation of the Settlement Agreement**

Both sides rely on New York principles of contract interpretation, and accordingly, New York law governs the interpretation of the Settlement Agreements. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("[T]he parties' briefs assume that New York law controls this issue, and such 'implied consent . . . is sufficient to establish choice of law.'") (quoting *Tehran-Berkeley Civil & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)); *accord Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

Under New York law, the fundamental objective of contract interpretation is to give effect to the intentions of the parties.  *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989); *Hartford Accident & Indemnity Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973).  If "the parties' intent is not plain from the language they used, a court may look to the objective manifestations of intent gathered from the parties' words and deeds," *In re M. Fabrikant & Sons, Inc.*, 385 B.R. 87, 95 (Bankr. S.D.N.Y. 2008) (citing *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977)); *accord Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998) (relying on testimony regarding what was objectively expressed between the parties during negotiations); *cf. Wells v.*

*Shearson Lehman/Am. Express, Inc.*, 526 N.E.2d 8, 15 (N.Y. 1988) (stating that uncommunicated subjective intent is irrelevant), including their subsequent conduct. *See Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 264 (2d Cir. 1965); *accord Foresco Co. v. Oh*, 315 F. Supp. 3d 812, 814 (S.D.N.Y. 2018); *Peter J. Solomon Co., L.P. v. Oneida Ltd.*, No. 09 CIV. 2229 (DC), 2010 WL 234827, at *3 (S.D.N.Y. Jan. 22, 2010).

When interpreting a contract, a court should not put "disproportionate emphasis" on "any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Brown Bros.*, 361 N.E.2d at 1001. "A contract must be read as a whole to determine its purpose and intent, and single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." *Analisa Salon, Ltd. v. Elide Props., LLC*, 818 N.Y.S.2d 130, 131 (N.Y. App. Div. 2006) (internal quotation marks and ellipses omitted). Furthermore, a court should not adopt a "construction which would render a contractual provision meaningless or without force or effect." *Valle v. Rosen*, 30 N.Y.S.3d 285, 287 (N.Y. App. Div. 2016) (internal quotation marks omitted).

Releases are interpreted in accordance with the rules that govern contract interpretation. *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001); *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985). The "meaning and coverage [of a release] necessarily depend, as in the case of contracts generally, upon the controversy being settled and upon the purpose for which the release was actually given." *Cahill v. Regan*, 157 N.E.2d 505, 510 (N.Y. 1959); *accord Clerico v. Pollack*, 48 N.Y.S.3d 738, 741 (N.Y. App. Div. 2017). Although the parties are

23

seeking declaratory and injunctive relief, CG Railway is essentially asserting that the

Settlement Agreements released it from withdrawal liability.  Regardless of the

procedural context, a party asserting the affirmative defense of release has the initial

burden of showing that the release covers the plaintiff's claims; the burden then shifts to

the other side to show that it does not.  *See Centro Empresarial Cempresa S.A. v. Am.*

*Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011); *see also Gerszberg v. Iconix*

*Brand Grp., Inc.*, No. 17-CV-8421 (KBF), 2018 WL 2108239, at *4 (S.D.N.Y. May 7,

2018) (under New York law, "a defendant has the initial burden of establishing that it

has been released from any claims.").

## C.    ERISA

Understanding the context surrounding the execution of the Settlement

Agreements requires consideration of the law that governs multiemployer pension plans

like the Plaintiffs, *i.e.*, the Multiemployer Pension Plan Amendments Act of 1980, 29

U.S.C. §§ 1381–1461.  The parties agree on the law, but a brief review is helpful.

In many cases, a defined benefit plan's projected liability for vested benefits

exceeds the projected amount of assets it will have to pay those benefits. The shortfall is

the unfunded vested benefits ("UVB"), which I refer to as unfunded liability.  The

unfunded liability is footnoted in a corporation's financial statements but is not treated

as a liability because it is not due and payable.  (Tr. (1/19) at 154:4-12.)

Rather, and at the risk of oversimplification, an employer's proportionate share of

the unfunded liability becomes due and payable when the employer withdraws from

participation in the multiemployer plan.  An employer is deemed to have withdrawn

completely from a multiemployer plan, *inter alia,* when it "permanently ceases to have

an obligation to contribute under the plan," 29 U.S.C. § 1383(a)(1), and the withdrawal

is deemed to have occurred on "the date of the cessation of the obligation to contribute."

*Id.*, § 1383(e).

The employer's withdrawal from the plan triggers its "withdrawal liability," roughly

the withdrawing employer's proportionate share of the plan's UVB. *Bay Area Laundry*

*& Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California, Inc.*, 522 U.S. 192, 196

(1997); *see* 29 U.S.C. §§ 1381(b)(1), 1391(b)(1). "As soon as practicable after an

employer's complete or partial withdrawal, the plan sponsor[16] shall" notify the employer

of the amount of its liability and a schedule of payments and demand payment in

accordance with the schedule. 29 U.S.C. §§ 1399(b)(1), 1381. If a withdrawing employer

fails to make a payment in accordance with the schedule and fails to cure the

nonpayment within sixty days of the payment due date, the plan may seek to recover the

employer's entire amount immediately and in full. 29 U.S.C. § 1399(c)(5)(A).

Withdrawal liability is not limited to the employer that withdraws from

participation in the pension plan. All companies under common control are deemed to

be a single employer, 29 U.S.C. § 1301(b), are jointly and severally liable for the

withdrawal liability, *see ILGWU Nat'l Retirement Fund v. Gramercy Mills, Inc.*, No. 90

Civ. 3552 (DNE), 1994 WL 592226, at *1 (S.D.N.Y. Oct. 26, 1994), and the notice and

---

[16] The "plan sponsor" is "with respect to a multiemployer plan—(A) the plan's joint board of trustees, or (B) if the plan has no joint board of trustees, the plan administrator." 29 U.S.C. § 1301(a)(10).

demand for payment sent to the withdrawing employer is also deemed to have been sent
to the other members of the control group. *Amalgamated Lithographers of Am. v. Unz
& Co. Inc.,* 670 F. Supp. 2d 214, 223 (S.D.N.Y. 2009) (quoting *Trustees of Amalgamated
Ins. Fund v. Saltz,* 760 F. Supp. 55, 58 (S.D.N.Y. 1991)); *McDonald v. Centra*, 118 B.R.
903, 914 (D. Md. 1990), *aff'd*, 946 F.2d 1059 (4th Cir. 1991).  To the extent the pension
plan does not collect the withdrawal liability from the withdrawing employer or the
control group, the unfunded liability is reallocated to the remaining contributing
employers but is not collectable from a remaining contributing employer unless and
until that employer withdraws from the pension plan.  (Tr. (1/20) at 206:6-13; 209:16-
210:18); *see* 2 Gary I. Boren & Norman P. Stein, QUAL. DEFERRED COMP. PLANS § 18:43
("If any of an employer's withdrawal liability remains unpaid under the payment
schedule after 20 years, the unpaid amount may be allocated to other employers in
addition to their basic withdrawal liability.").

Here, CG Railway was a member of the ISH control group.  The Signatory
Debtors withdrew from the Pension Plans on July 2, 2017, one day before the Effective
Date, paving the way for SEACOR to take over Reorganized ISH without any obligation,
as agreed with the Unions, to make contributions to the Pension Plans.  The Signatory
Debtors' withdrawal triggered the withdrawal liability of the control group under ERISA
unless that liability was released by the Settlement Agreements.

### D.    The Settlement Agreement

With this background, I turn to the interpretation of the Settlement Agreement
and begin with the context.  During the relevant period between SEACOR's agreement
in principle to fund a plan and the execution of the Settlement Agreements, two separate

26

concerns existed. First, the Debtors did not have enough money to pay the Pension

Plans' administrative and priority claims. To confirm their plan, they had to pay these

claims in full unless the Pension Plans agreed to different treatment. *See* 11 U.S.C. §

1129(a)(9)(A) & (B). SEACOR made clear that it would not contribute or loan any more

money. Consequently, the Debtors had to reach agreements with the Pension Plans to

accept less than 100% on their administrative and priority claims. This was purely a

plan issue between the Debtors and the Pension Plans. Its resolution did not concern

SEACOR except that the confirmation of the Plan was a necessary condition to

SEACOR's acquisition of ISH. The Pension Plans eventually agreed to accept a 72%

distribution. The Settlement Agreement memorialized their consent, capping the

Pension Plans' administrative and priority claims and relegating any balance, including

the contingent liability for withdrawal contributions, to general, unsecured status. This

much is undisputed.

Second, SEACOR refused to participate in the Pension Plans post-Effective Date.

This was not a plan issue; it was a labor issue between the Unions and SEACOR and the

subject of the CBA negotiations between the Unions and SEACOR. Reorganized

ISH/SEACOR eventually resolved this issue by entering into the New CBAs which did

not require contributions to the Pension Plans. Again, this is not disputed.

Related to this second issue was the question of post-Effective Date withdrawal

liability. The withdrawal of the Signatory Debtors from the Pension Plans would trigger

the entire control group's liability, including the liability of non-debtor members such as

CG Railway. SEACOR was proposing to acquire the equity of ISH, and ISH held the

equity in the non-debtor subsidiaries, including CG Railway. If these non-debtor

subsidiaries were jointly and severally liable for $58 million in withdrawal liability after the Effective Date, the deal would not make economic sense to SEACOR.  (*See* Tr. (1/20) at 36:7-14.)  For this reason, SEACOR viewed the continuing participation in the Pension Plans and the related withdrawal liability issues as "non-starters."

Everyone involved in or present during the CBA negotiations, including the representatives of the Unions and the Pension Plans, understood that if they could not reach an agreement with SEACOR, the Debtors would likely be forced to liquidate, the Union members would lose their jobs, and the Pension Plans would receive little or no distribution on any of their claims.  (Tr. (1/20) at 60:3-9; 100:10-25; 189:5-14.)  Thus, an agreement with SEACOR was indispensable to the Debtors' ability to confirm a plan, the Unions' hopes of keeping jobs and the Pension Plans' expectation of receiving any distribution.

It is undisputed that SEACOR made clear to the Union and Pension Plan representatives during the CBA negotiations that its continued participation in the Pension Plans was a "non-starter," and as a CBA issue, this was discussed.  But I also credit the testimony of Lowry, Leyden, and Cameron that Lowry stated that post-Effective Date withdrawal liability was a "non-starter."  It was a critical issue to SEACOR, and SEACOR would not have ignored it.  It was not the subject of further discussion during the CBA negotiations because withdrawal liability was a Pension Plan issue rather than a Union issue.  Nevertheless, Marcus and Ainley, the chief Union negotiators, were also the chairmen of the Boards of Trustees of the Pension Plans, and the Pension Plan's lawyers participated in the meetings as well.  They heard what Lowry said and were aware of SEACOR's "line in the sand" regarding withdrawal liability.

28

Moreover, it would have been absurd for the Pension Plans to believe that SEACOR would insist on withdrawing from the Pension Plans, which everyone knew would trigger withdrawal liability, but agree to absorb the $58 million withdrawal liability.

At trial, Marcus and Ainley disputed that Lowry or anyone else ever mentioned withdrawal liability during the CBA negotiations.[17]  I do not credit this testimony. Marcus was already aware of the withdrawal liability issue because of his October 2016 meeting with Cameron.  In addition, Marcus testified that when he signed the MM&P Settlement Agreement, he knew that withdrawal liability would extend to ISH's subsidiaries and affiliates, and SEACOR would not agree to assume any obligations owed to the Pension Plans that arose prepetition.  (Tr. (1/20) at 103:17-104:1.)  Ainley testified that he understood that SEACOR's intention not to participate in the MEBA Pension Plan would trigger withdrawal liability, that SEACOR was going forward with a "clean slate" and would not participate in the defined benefit plan and "on the trustee level, they were not accepting any liability."  (Tr. (1/20) at 162:10-164:21.)  In short, the Pension Plans knew that SEACOR would not agree to any deal that rendered ISH's non-debtor subsidiaries subject to withdrawal liability.[18]

This conclusion is bolstered by the Pension Plans' historical silence and failure to object to the waiver of withdrawal liability.  The November Waiver Letter was sent with

---

[17]      Representatives from Slevin & Hart did not testify in the Plaintiffs' direct case.  Leins only testified in rebuttal that Leyden never discussed withdrawal liability with him.  Furthermore, although Leyden testified that she had similar conversations with Bowers and Slevin, they did not testify.

[18]      The Pension Plans have argued that they did not know which subsidiaries SEACOR would be acquiring, but this did not seem to make a difference to the Pension Plans.  The Settlement Agreement granted waivers to all ISH past, present, and future subsidiaries and affiliates without regard to whether they were being acquired indirectly by SEACOR.

an email to Leins that began, "as discussed."  There was obviously referred to a discussion between Leyden and Leins, Slevin, and/or Bowers before she sent the November Waiver Letter.  In addition, Leyden testified that she had informed Leins that the Unions and SEACOR had reached a tentative agreement pursuant to which Reorganized ISH/SEACOR would withdraw from the Pension Plans and trigger withdrawal liability, and she would send a waiver agreement.  (Tr. (1/21) at 156:20-157:23.)  After she sent the November Waiver Letter, neither Leins nor any other attorney representing the Pension Plans ever responded that they had not agreed to the waivers it contained.  For this reason, Leyden was surprised when she saw the March 2018 Notice and Demand Letters because, until then, Slevin & Hart attorneys never suggested that the November Waiver Letter did not set forth the parties' agreement relating to the waiver of withdrawal liability.  (*See* Tr. (1/21) at 197:21-199:17.)

Indeed, when Leins returned the marked-up version of the February Draft, he never suggested that he had made any substantive changes.  Instead of agreeing not to assert any claims against Reorganized ISH, SEACOR, or their past, present and future subsidiaries or affiliates, the revised language agreed not to assert any priority or administrative claims, the subject of the recently concluded negotiations, against ISH, SEACOR, or their past, present and future subsidiaries *for unpaid contributions* owed through the date of the Settlement Agreement.  He did not make a material change to the release of withdrawal liability.  Leins modified the language of the waiver by deleting the phrase "withdrawal or cessation from participation in the [Pension Plans], or any other obligation, contractual or statutory" and inserting "any withdrawal liability *incurred* by ISH or any other past or present subsidiary or affiliate thereof."  (Emphasis

30

added.)

The Plaintiffs argue that under the principle of *ejusdem generis*,[19] "priority or administrative claims" must be read to limit the scope of the release or waiver of liability for withdrawal liability.  Thus, they read the Settlement Agreements to waive "priority or administrative claims . . . relating to . . . any withdrawal liability incurred by ISH or any other past or present subsidiary or affiliate thereof."  At bottom, the Plaintiffs maintain that the Settlement Agreement was limited to the claims in the bankruptcy cases.

In contrast, CG Railway argues the Settlement Agreement effected two settlements, one by the estates and one in favor of Reorganized ISH/SEACOR.  The former limited the administrative and priority claims accruing prior to the date of the Settlement Agreements to the amounts of the Settlement Payments subject to the provisos that any excess administrative or priority claims as of the date of the Settlement Agreements and any "contingent, estimated or actual" withdrawal liability could be pursued as a general, unsecured claim and any post-Settlement Agreement unpaid contribution claims could be pursued as administrative expenses.  The second settlement concerned SEACOR and the non-debtor subsidiaries and affiliates after the Effective Date.  Withdrawal liability in the amount of $58 million was a post-Effective Date concern of SEACOR because it was acquiring ownership of Reorganized ISH and indirectly, ISH's debtor and non-debtor subsidiaries.

---

[19]    Under the principle of *ejusdem generis,* "the general words of a release are limited by the recital of a particular claim."  *Herman v. Malamed,* 487 N.Y.S.2d 791, 793 (N.Y. App. Div. 1985); *accord Consolidated Edison, Inc. v. Northeast Utilities*, 332 F. Supp. 2d 639, 647 (S.D.N.Y. 2004); *Kemp v. Perales*, 604 N.Y.S.2d 268, 270 (N.Y. App. Div. 1993).

The Plaintiffs have not offered a cogent explanation for the revisions inserted by Leins, no draftsman testified about them, and the revisions cannot support the Plaintiffs' proffered interpretation that the Settlement Agreements were limited to the pending bankruptcy cases. As noted, it is meaningless to speak of capping administrative and priority claims against non-debtors and future subsidiaries. The Plaintiffs have argued that the phrase could be rendered meaningful by reading it to limit the Pension Plans' administrative and priority claims in future, hypothetical bankruptcies commenced by non-debtor subsidiaries and thereby give it meaning. (Tr. (1/22) at 6:13-23.) There is no evidence to support this interpretation, and future bankruptcies were never discussed.

The Plaintiffs contend that the same problem exists with CG Railway's interpretation, but I disagree. CG Railway has argued that the release of SEACOR and its future subsidiaries, including Reorganized ISH and its subsidiaries, is rendered meaningful by reading it to prevent the Pension Plans from going after Reorganized ISH/SEACOR or any of ISH's subsidiaries post-confirmation, presumably under a theory of successor liability, for any unpaid administrative and priority claims relating to unpaid contributions that were not paid under the Plan. (*See* Tr. (1/22) at 36:11-37:2.)

Furthermore, as Leyden testified, the revised language still gave ISH and SEACOR everything they were seeking or demanded. The Settlement Agreement capped the administrative and priority claims in the pending cases and allowed the Debtors to confirm their cases. The waiver of administrative and priority claims granted to non-debtor subsidiaries and future subsidiaries gave them something extra.

Nor can the waiver relating to the withdrawal liability claims be limited to the bankruptcy cases.  First, as already stated, the waiver was granted to the past, present and future subsidiaries and affiliates.  Second, the Settlement Agreement expressly dealt with the Debtors' withdrawal liability, deeming it an unsecured claim.  The waiver was, therefore, unnecessary to deal with the Debtors' liability.  Third, the waiver covers "any withdrawal liability *incurred* by ISH or any other past or present subsidiary or affiliate thereof."  (Emphasis added.)  Under ERISA, withdrawal liability was not "incurred" until ISH withdrew from the Pension Plans on July 2, 2017.[20]  Thus, the Settlement Agreement must be read to waive withdrawal liability "incurred" by the non-Debtor subsidiaries as a result of the Signatory Debtors' withdrawal from participation in the Pension Plans.

Finally, *ejusdem generis*, like other "rules of contract interpretation need not be applied unless 'the extrinsic evidence does not yield a conclusive answer as to the parties' intent.'" *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 118 n.7 (2d Cir. 2010) (quoting *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 43 (2d Cir.2006)).[21]  The extrinsic evidence adduced by CG Railway showed conclusively that the Pension Plans understood SEACOR's "non-

---

[20]    The Pension Plans could assert contingent claims for withdrawal liability in the bankruptcy cases before withdrawal liability was actually triggered because the Bankruptcy Code defines "claim" to include a contingent claim.  *See* 11 U.S.C. § 101(5)(A).  Outside of bankruptcy and under ERISA, however, withdrawal liability is "incurred" when the employer withdraws from participation in the defined benefit plan.

[21]    The Pension Plans' invocation of *ejusdem generis* calls to mind another rule of construction, the canon *contra proferentem*, under which ambiguities are construed against the drafter.  *151 W. Assocs. v. Printsiples Fabric Corp.*, 460 N.E.2d 1344, 1345 (N.Y. 1984).  Here, Slevin & Hart attorneys presumably drafted the ambiguous language.

starters" and had to waive withdrawal liability against the Signatory Debtor's control

group in order to confirm the Plan, keep jobs, and receive the Settlement Payments.[22]

Further, Leyden testified that she had discussed the November Waiver Letter, the source

of the February Draft and the Settlement Agreements, including the waiver of

withdrawal liability, with Leins, Bowers, and Slevin.  Leins denied such conversations in

rebuttal testimony, but neither Bowers nor Slevin testified.  I credit Leyden's testimony

and find it unbelievable that Leyden did not discuss this "non-starter" with the Pension

Plans' attorneys, and instead, snuck it into the November Waiver Letter hoping they

wouldn't notice.

The Pension Plans' actions and statements after the Settlement Agreement was

signed, including the MEBA Pension Plan's responses to the charges asserted by Liberty

Maritime Corporation ("Liberty") and the Pension Plans' delay in asserting their rights,

provide further evidence that they understood that they had waived their withdrawal

liability claims against the control group members.  On February 13, 2017, the same day

that Leins sent the marked-up Settlement Agreement, Philip Shapiro, President and

CEO of Liberty, a participating employer in the MEBA Pension Plan, sent a letter to the

Employer Trustees of the MEBA Pension Plan and copied Ainley and John Ring, Esq.,

counsel to the MEBA Pension Plan, complaining about the effect of settlement on the

MEBA Pension Plan.  (DX 78.)  Liberty expressed its concern that the MEBA Pension

Plan was accepting less than full payment of its administrative and priority claims and,

---

[22]    The Pension Plans have argued that they did not get any additional consideration for the
withdrawal liability waivers, and therefore, the waivers should be limited to the claims in the bankruptcy
cases.  This argument ignores the fact that if the Pension Plans didn't accede to SEACOR's demands, its
"non-starters," SEACOR would have walked and the Pension Plans would not have received the
Settlement Payments or much else.

under the New CBA, SEACOR would withdraw from participation in the MEBA Pension

Plan and not make any future contributions.  Liberty charged that those involved in the

negotiations on behalf of the MEBA Pension Plan "have conflicts of interest" and the

Employer Trustees were not receiving independent legal advice.  Shapiro recommended

that the Employer Trustees hire independent counsel "to ensure that the rights of the

Plan are fully protected and not compromised in favor of any unrelated considerations,"

and insisted that the Employer Trustees "select an independent trustee to engage in any

negotiations or discussions with ISH/Seacor based on such independent counsel

advice."

On March 7, 2017, five days after confirmation, Liberty's counsel, Constantine G.

Papavizas, Esq. of Winston & Strawn, wrote to Slevin, copying Ainley, Ring, and Edward

Hanley, an Employer Trustee.  (DX 98.)  The letter primarily expressed concern with the

lack of information or justification for compromising the administrative and priority

claims and agreeing that Reorganized ISH/SEACOR would not participate in the MEBA

Pension Plan.  It noted that the substantial, $22 million withdrawal claim would likely

receive only a nominal recovery and expected that the "MEBA Benefit Plan trustees

might have some defense to the argument that plan assets have been squandered."  The

matter was of particular concern "given Liberty's ultimate obligation, along with other

contributing employers, to fund any plan deficit, which the SEACOR/ISH transaction

appears to have materially exacerbated."

On April 6, 2017, Shapiro again wrote to the MEBA participating employers and

leveled more criticism at the settlement.  (DX 99.)  The letter stated that the "MEBA

Benefit Plans have wasted Plan assets for no consideration to the detriment of its

beneficiaries and the other employers that participate in the Plans," and enlisted the

Employer Trustees' assistance in the matter.  Liberty continued to complain about the

economics of the settlement, "the substantial discount, the loss of future plan

contributions and a waiver of any withdrawal liability," and reiterated its concerns that

"[a]ll contributing employers will ultimately pay the price for those concessions in terms

of the reduced recovery to the Plans, the loss of future pension plan contributions and

the associated possible withdrawal liabilities."

        The MEBA Benefit Plans finally responded in writing to "the serious nature of

Liberty's accusations" on April 13, 2017.  (DX 100.)  In a letter to the MEBA

participating employers signed by Ainley and Hanley, an Employer Trustee of both the

MEBA and MM&P Pension Plans, (Tr. (1/21) at 7:17-21; 8:20-24), they defended the

deal as the best and only deal absent which MEBA would face the loss of jobs and the

MEBA Benefit Plans would recover little or nothing.  The penultimate paragraph of the

letter stated:

> We understand Liberty's disappointment over the ISH bankruptcy and its
> negative impact on the MEBA Plans.  The Trustees share that
> disappointment.  It is estimated that MEBA Plans will be required to
> *write-off* approximately $945,920 in delinquent ISH contributions
> (because of the non-priority portion of the claims) and over $20 million in
> *uncollectable* withdrawal liability.

(Emphasis added.)

        At trial, Ainley testified that "write-off" as used in the letter really meant

"reallocate," and the letter was "just informing the contributing employers that if

nothing was recovered, then worst-case scenario they were looking at an estimated $20

million that would be reallocated.  So . . . write-off may not have been the perfect term."

36

(Tr. (1/20) at 147:7-23.)  Hanley gave the same testimony.  (Tr. (1/21) at 13:4-15:14.)

I find this testimony incredible.  First, "write-off" means uncollectable, not collectable from other sources.  It does not mean "reallocate," and it is not likely that Ainley and Hanley sought to placate Liberty or the other participating employers by telling them that the withdrawal liability would be reallocated to them.  In addition, one month earlier, Hanley had informed the MEBA Employer Trustees that the ISH bankruptcy "will cause a write off of $21.63M assuming the non-priority claims are settled" for 3% and "*[t]he write offs to all 3 union plans combined is $57M*."  (DX 97 (emphasis added).)

Second, and more importantly, Liberty had made "serious" allegations, accusing the Union representative and the Union Trustee—Ainley—of conflict of interest, breach of fiduciary duty, and squandering and wasting MEBA Pension Plan assets.  Liberty had highlighted the economic injuries the other contributing employers would suffer, including the obligation to fund any plan deficits through the reallocation of ISH's withdrawal liability.  If the MEBA Pension Plan retained the right to collect the "reallocated" withdrawal liability from the remaining, non-debtor members of the ISH control group, one would expect that the letter would have said that to soften the blow of Liberty's charges and its economic concerns regarding funding plan deficits.  It did not.

Subsequent correspondence provided further proof of the MEBA Pension Plans' understanding that it could not collect the withdrawal liability from the non-debtor members of the ISH control group.  Three weeks after the Effective Date, on July 24, 2017, lawyers at Morgan & Lewis and Slevin & Hart, co-counsel to the MEBA Pension

37

Plans, wrote to Papavizas, Liberty's counsel at Winston & Strawn.  (DX 110.)  Most of the letter defended against the claim that Ainley had breached his fiduciary duties.  The last two pages, however, were devoted to correcting "factual misstatements that Liberty has made in its communications to the employer trustees."  One of those factual errors concerned the charge that the MEBA Pension Plan had waived withdrawal liability.  The MEBA Pension Plan's counsel responded that

> the Pension Plan did not waive withdrawal liability since the Pension Plan has filed a proof of claim seeking payment of withdrawal liability as a general unsecured creditor.  The Pension Plan expects to collect on its claim to the same extent as other general unsecured creditors. . . .  [The] proof of claim for withdrawal liability . . . has not been compromised or withdrawn.

Again, had the MEBA Pension Plan retained the right to pursue the non-debtor members of the ISH control group, one would expect that its counsel would have included that fact in the letter.

The Pension Plans' belated assertion of their right to collect withdrawal liability from the non-debtor members of the ISH control group provides further evidence that their position in this litigation is newly minted.  Under ERISA, "[a]s soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall" notify the employer of the amount of its liability and a schedule of payments and demand payment in accordance with the schedule.  29 U.S.C. §§ 1399(b)(1), 1381.  ISH withdrew from participation in the Pension Plans and "incurred" withdrawal liability on or about the Effective Date, but the Pension Plans did not notify the non-debtor subsidiaries, including CG Railway, of the amount of the liability, the schedule of payments, or demand payment until March 2018, eight months later.

38

During closing argument, the Court questioned the Plaintiffs' counsel about the reason for the delay.  Counsel essentially argued that it was not practicable for the Pension Plans to act before they did.  He stated that once an employer withdraws and triggers withdrawal liability, actuaries must calculate the withdrawing employer's proportionate liability and this calculation requires the prior plan year's full data. Several factors go into that calculation, including investment performance, and those factors are not finalized until the plan year closes and the actuaries have the data.  It is only then that the actuaries can finalize the assessment, and the assessment in this case was made in March 2018.  (Tr. (1/22) at 26:8-28:17.)

No evidence was offered during the trial to support these assertions, and I do not credit counsel's statements in the absence of supporting evidence.  The delay implies that the Pension Plans did believe they had viable claims for withdrawal liability at the time of the Settlement Agreements, and the Court finds that the belated assertion of withdrawal liability was an afterthought and not what was understood or intended at the time of the Settlement Agreements.  Accordingly, CG Railway has sustained its burden of proving that through the Settlement Agreement, the Pension Plans intended to release the non-debtor members of the ISH control group from the withdrawal liability that was incurred when the Signatory Debtors withdrew from the Pension Plans, and the Plaintiffs have failed to come forward with any credible extrinsic evidence to controvert the Defendant's proof.  Accordingly, the *Complaint* is dismissed, and CG Railway is entitled to a declaratory judgment on Count I of its Counterclaim that the Settlement Agreement released CG Railway from withdrawal liability.

**E.     Injunctive Relief**

39

Count II of the Counterclaim seeks an

injunction prohibiting the Plaintiffs from pursuing any further action whatsoever in court or out of court to recover against the Debtors, Reorganized Debtors, or SEACOR or the foregoing's respective past, present, or future subsidiaries or affiliates, including the Defendant CG Railway, on account of claims arising from or related in any way to: (1) unpaid contributions to the Pension Plans; or (2) any contingent, estimated, or actual withdrawal liability incurred as a result of withdrawal from the Pension Plans.

A party "seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

CG Railway has failed to establish that it will suffer irreparable injury if a permanent injunction does not issue. The sole evidence of harm was provided by Scott Weber, SEACOR Holdings' senior vice president in charge of corporate development and finance. (Tr. (1/20) at 5:19-23.) He is also a vice president of CG Railway and a director on the joint venture board that oversees the group of entities that includes CG Railway, but he does not have any day-to-day responsibilities with CG Railway. (Tr. (1/20) at 20:22-21:12.) Weber testified as follows:

Q.      All right. How, if at all, has this litigation been harmful to CG Railway?

A.      Well, it's -- it's taken a lot of time. It's been a big distraction. It -- it's a company that is, you know, impacted by current events and the

40

> pandemic.  And more fundamentally, it's a company that relies on old --
> very old equipment that it -- it inherited from this restructuring.  It needs
> new equipment.  It needs financing, and that financing is in jeopardy
> based on this proceeding.

(Tr. (1/20) at 40:1-9.)

This testimony is speculative and conclusory.  The nature of the distraction, and specifically, how the litigation harmed CG Railway (as opposed to non-party Reorganized ISH or SEACOR) was never explained.  Furthermore, the litigation has now ended, and CG Railway did not offer evidence that the Plaintiffs will ignore the Court's decision and continue their efforts to collect withdrawal liability.  It is true that the final judgment is subject to appeal, which the proposed injunction is broad enough to prevent, but the Court would not enjoin the Pension Plans from pursuing an appeal.  And as to the jeopardized funding that Weber mentioned, there is no evidence that CG Railway could not obtain financing because of the pendency of this lawsuit or the Pension Plans' efforts to collect withdrawal liability through the prosecution of this adversary proceeding.

In addition, CG Railway contended in the JPTO that it has suffered irreparable reputational injury and needless expense, (JPTO at p. 53), and the unpaid contribution and withdrawal liability claims "imposed a substantial hardship on a company freshly emerging out of bankruptcy that requires all resources to be focused on operating as a going concern." (*Id*. at p. 60.)  There was no evidence of reputational injury and the notion of "needless" expense implies that the litigation was frivolous.  But there are adequate monetary remedies to compensate CG Railway if that is the case.  In addition, the litigation could not interfere with CG Railway's emergence from bankruptcy because

CG Railway was never in bankruptcy.

Finally, the two cases cited by CG Railway in the JPTO are distinguishable.  In *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109 (Bankr. N.D. Tex. 2002), the debtor proposed a 100% plan.  The debtor's lenders held the personal guaranty of Kahn, the sole director and "the driving force behind the success (or failure) of the Debtor company."  *Id.* at 117.  The Court confirmed the 100% plan and issued a *temporary* stay in Kahn's favor preventing the lenders from pursuing Kahn for so long as the debtor did not default on its plan payments to the lenders.  The Court reasoned that the debtor would suffer irreparable injury, because it will not successfully reorganize if the lenders pursue their individual guaranty claims and/or judgments against Kahn, Debtor's largest asset at the outset of Debtor's reorganization.  *Id.* at 118.  Here, there was no credible evidence that the Pension Plans' pursuit of withdrawal liability claims against CG Railway has adversely affected the Debtors' ability to reorganize.

In *Xiotech Corp. v. Express Data Prods. Corp.*, No. 6:13-CV-861 MAD TWD, 2013 WL 4425130 (N.D.N.Y. Aug. 14, 2013), the defendant was a reseller of the plaintiff's goods.  It failed to pay the plaintiff for the goods it purchased but sold those goods and collected substantial amounts from their resale.  The District Court granted the plaintiff's motion for a temporary restraining order and preliminary injunction preventing the defendant from transferring the goods or the proceeds of the sales.  The Court concluded that although the plaintiff was suing for money damages, it had demonstrated irreparable harm under the insolvency exception which allows the issuance of a preliminary injunction where the defendant is a "perilous financial state." *Id.* at *3.  Here, CG Railway is not suing an insolvent defendant, and the insolvency

exception does not apply.

Given the Court's conclusion that CG Railway has not demonstrated irreparable harm, the Court does not reach the remaining elements of the claim for permanent injunctive relief.  Accordingly, Count II of CG Railway's counterclaims is dismissed.  The Court has considered the parties' remaining arguments and concludes that they are without merit.  CG Railway is directed to promptly settle a judgment on notice.

Dated:   New York, New York
              February 16, 2021

                                              /s/ *Stuart M. Bernstein*
                                              STUART M. BERNSTEIN
                                              United States Bankruptcy Judge